

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-2004

# USA v. Lloyd

Precedential or Non-Precedential: Precedential

Docket No. 03-1287

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Lloyd" (2004). *2004 Decisions*. Paper 887.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/887

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>PRECEDENTIAL</u>

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-1287
_____

UNITED STATES OF AMERICA

v.

BENJAMIN J. LLOYD,
                    Appellant

_____

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
PENNSYLVANIA

District Court Judge: Honorable Maurice
B. Cohill, Jr.
(No. 02-CR-139)

_____

Argued: October 22, 2003

Before:  ALITO, FUENTES, and
ROSENN, <u>Circuit Judges</u>

(Opinion Filed: March 17, 2004 )

MARK A. SINDLER (Argued)
429 Forbes Avenue, Suite 450
Pittsburgh, PA 15219
Wilmington, DE   19801
*Counsel for Appellant*

MARY BETH BUCHANAN
BONNIE R. SCHLUETER
KELLY R. LABBY (Argued)
Post Office and Courthouse
700 Grant Street, Suite 400
Pittsburgh, PA  15219
*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

ALITO, <u>Circuit Judge</u>:

Benjamin J. Lloyd appeals a judgment of conviction and sentence.  He argues that his offense level was improperly adjusted upward under U.S.S.G. § 2K2.1(b)(5) as that provision was interpreted in <u>United States v. Fenton</u>, 309 F.3d 825 (3d Cir. 2002). Because we hold that his offense level was correctly determined, we affirm.

**I.**

Lloyd was alleged to be part of a drug ring headed by Armando Spataro. On July 1, 2001, Spataro was involved in a dispute with a man named Thomas Learn, whom he accused of "hitting on" a woman whom Spataro had been dating. Several days later, Lloyd, Spataro, and other members of the drug ring conferred about how best to get even with Learn. Some members of the group had apparently started dabbling in bomb-making (with the aid of instructions downloaded from the Internet), and it was decided that a bomb should be built

and placed under the fuel tank of Learn's truck.

Spataro and another member of the ring (not Lloyd) accordingly set out to purchase materials and construct the bomb. On the morning of July 4, 2001, Spataro gave the completed bomb to Lloyd and some others, with instructions to position the bomb as planned and to detonate it. Upon arriving at Learn's residence, Lloyd, acting alone, placed the device under the fuel tank of Learn's car, lit the fuse (which consisted of a cigarette), and fled the scene with his companions. Lloyd was later paid $100 for this act.

Contrary to the wishes of Spataro and friends, the scheme did not succeed. Later that day, as Learn was about to enter the truck, his dog alerted him to the presence of the undetonated device under the vehicle. Learn contacted the authorities, who disassembled and examined the bomb. The authorities concluded that the bomb was "capable of exploding" and would have exploded had it not been for the "malfunction of the cigarette."

Learn informed the police that he suspected that Spataro might have been behind the failed plot. Lloyd, Spataro, and several of their companions were subsequently apprehended and indicted by a grand jury sitting in the Western District of Pennsylvania. Lloyd was charged under two counts: possession of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d), and conspiracy to violate that provision, in violation of 18 U.S.C. § 371. Lloyd pled guilty to both counts.

In the process of calculating Lloyd's sentence, the presentence report recommended that the District Court add four points to Lloyd's base offense level pursuant to U.S.S.G. § 2K2.1(b)(5), which provides for such an adjustment when it is found that a defendant "used or possessed any firearm . . . in connection with another felony offense; or possessed or transferred any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense . . . ."

Lloyd objected to the proposed adjustment, contending that the allegedly felonious conduct on which the proposed adjustment was based was essentially the same conduct that formed the basis for the underlying counts to which he had pled guilty. This, he argued, was contrary to this Court's decision in United States v. Fenton, 309 F.3d 825 (3d Cir. 2002), which held that § 2K2.1(b)(5) requires "*another* felony offense," separate and apart from the base offense. Id. at 828 (emphasis added). The District Court, however, found that the act of placing the bomb and igniting it was sufficiently different from the acts of conspiracy and possession so as to distinguish this case from Fenton. The District Court accordingly applied the four-point

2

adjustment prescribed under § 2K2.1(b)(5). Lloyd now disputes that holding on appeal.

## II.

### A.

Section 2K2 of the Sentencing Guidelines governs sentence determinations for convictions based on violations of federal firearms laws. In particular, § 2K2.1(b)(5) of the Sentencing Guidelines provides for a four-offense-level adjustment for a firearms offense if the defendant used or possessed any firearm "in connection with another felony offense" or "with reason to believe that it would be used or possessed in connection with another felony offense."

The use in § 2K2.1(b)(5) of the phrase "another felony offense" — as opposed to "any felony offense" — represents an attempt by the drafters of the Sentencing Guidelines to avoid the "double counting" of certain elements of criminal activity already incorporated into the base offense level. For example, if a defendant is convicted of the crime of being a fugitive in possession of a firearm (a felony under 18 U.S.C. § 922(g)(2)), it would make little sense to adjust the defendant's offense level upward because he possessed the firearm in connection with the very felony of his conviction (that is, fugitive possession of a firearm). The word "another" avoids just such an absurd result.

Nevertheless, while it is clear that a felony conviction leading to a sentence cannot be bootstrapped to enhance itself under § 2K2.1(b)(5), it is equally clear that the guideline was not intended to exclude only the technical offense of conviction from the scope of "another felony offense." In this regard, it is instructive to note that the Supreme Court has held that where two crimes each require proof of some element that the other does not, they may be considered effectively distinct in a variety of contexts: in determining whether there has been a violation of the Fifth Amendment prohibition against double jeopardy, Brown v. Ohio, 432 U.S. 161, 164-166 (1977); in identifying the offenses to which the Sixth Amendment right to counsel attaches, Texas v. Cobb, 532 U.S. 162 (2001); and in deciding as a matter of statutory interpretation when Congress intended to affix multiple punishments to the same conduct, Blockburger v. United States, 284 U.S. 299 (1932). Analogizing from this line of cases, at least one court of appeals has explicitly employed the "Blockburger" element-based analysis in the context of § 2K2.1(b)(5) for the purposes of determining when a crime is "another felony offense." United States v. Blount, 337 F.3d 404 (4th Cir. 2003); see id. at 409 (noting that Blockburger is easier to apply than any "vague iterations of the 'closely related to' or 'inextricably intertwined with' test," citing Cobb, 532 U.S. at 173). Although we have not heretofore applied Blockburger in connection with § 2K2.1(b)(5), we

3

believe that the "distinction in time or conduct" test set forth in Fenton requires that a felony offense must *at least* satisfy Blockburger before it may be used to adjust a sentence upward under § 2K2.1(b)(5).

On the other hand, we also explained in Fenton that Application Note 18 to U.S.S.G. § 2K2.1 ("Note 18") suggests, at least with respect to a certain category of cases, a slightly narrower understanding of the phrase "another felony offense" — an understanding that yields a more limited scope for § 2K2.1(b)(5) than would result from a strict application of Blockburger across the board.  Note 18 explicitly elaborates on the meaning of "another felony offense":

> *As used in subsection[] (b)(5) . . . "another felony offense" . . . refers to offenses other than . . . firearms possession or trafficking offenses.* However, where the defendant used or possessed a firearm or explosive to facilitate another firearms or explosives offense (e.g., the defendant used or possessed a firearm to protect the delivery of an unlawful shipment of explosives), an upward departure under § 5K2.6 (Weapons and Dangerous Instrumentalities) may be warranted.

U.S.S.G § 2K2.1, cmt. n.18 (emphasis added).[1]  In other words, regardless of the interpretation given to the word "another" in 2K2.1(b)(5), "firearms possession or trafficking offenses" are categorically removed from the set of crimes that may constitute "another felony offense."[2]

Thus, in United States v. Boumelhem, 339 F.3d 414 (6th Cir. 2003), the Sixth Circuit held that the offense level of a man convicted of a firearms possession felony  could not be adjusted under § 2K2.1(b)(5) on the basis of a conspiracy to violate 18 U.S.C. § 922(e) (delivery of a firearm or

---

[1] Commentary to the Sentencing Guidelines is authoritative unless it violates the  Constitution or a federal statute or is clearly inconsistent with the text of the Guidelines.  Stinson v. United States, 508 U.S. 36, 40-48 (1993).

[2] While some criminal defendants have attempted to argue that the term "trafficking offenses" should be read as referring only to *drug* trafficking offenses, courts have uniformly rejected such arguments.  See, e.g., United States v. Gomez-Arrellano, 5 F.3d 464, 466 (10th Cir. 1993) ("[The phrase] 'trafficking offenses' as used in . . . Note 18 refers only to weapons trafficking offenses, and not to drug trafficking offenses.").

ammunition to a common carrier for shipment without written notice to the carrier).  The defendant argued that the § 922(e) charge was not "another felony offense" for the purposes of § 2K2.1(b)(5), since the "conspiracy to ship or transport firearms and ammunition in foreign commerce [was] a 'firearms trafficking offense' as that phrase is used in [Note 18]."  Id. at 427.  The Court agreed, and the sentence was vacated and remanded for reconsideration.  In order to understand this decision, it is important to note that, while § 922(g) and § 922(e) clearly constitute distinct felonies under Blockburger (since each requires proof of an element that the other does not), Note 18 operated nonetheless to take the conspiracy to violate § 922(e) outside the scope of the term "another felony offense."  Similarly, in United States v. English, 329 F.3d 615 (8th Cir. 2003), where a defendant's sentence for felony firearm possession had been enhanced because the defendant had sold the guns associated with the possession offense, the Eighth Circuit pointed out that the sale of firearms constituted "trafficking" under Note 18, and that, accordingly, the sale could not be counted as "another felony offense."  Id. at 617.

While it is thus clear that a "firearms possession or trafficking offense" cannot be "another felony offense" under § 2K2.1(b)(5), it is equally clear that there is some narrow disagreement among the courts of appeals regarding the precise scope of the term "firearms possession . . . offense."  For example, the Eighth Circuit has held that "a firearms offense is necessarily an offense which contains, as an element, the presence of a firearm."  English, 329 F.3d at 618.  Under this view, felony crimes of theft or burglary are not considered firearms possession offenses, even if the objects taken happened to be firearms.  United States v. Kenney, 283 F.3d 934, 937-38 (8th Cir. 2002) ("[B]ecause [the defendant's] burglary offense is not specifically excluded from consideration [under Note 18], it constitutes 'another felony offense' in addition to the firearms possession offense.");  see also English, 329 F.3d at 618 ("The Kenney Court read [Note 18] narrowly . . . .").  Likewise, the felony of "possession of stolen property," while undoubtedly a possession offense, would not be a *firearms* possession offense, and so would fall outside the scope of Note 18.  English, 329 F.3d at 619 ("[T]he gist of [Iowa Code § 714.1(4)] is the knowing possession of property of a certain value, whether or not that property happens to be a gun.").

By contrast, our Court and the Sixth and Seventh Circuits have taken a broader view of what constitutes a firearms possession offense.  For example, in United States v. Szakacs, 212 F.3d 344 (7th Cir. 2000), the Seventh Circuit, while noting that the language of Note 18 was somewhat "equivocal," ultimately held that the fact that the burglary in that case involved the

theft of weapons "arguably [made] the burglary a 'possession or trafficking offense' in the general sense that [Note 18] uses the phrase." Szakacs, 212 F.3d at 350. The Szakacs court found that the phrase "possession and trafficking offenses" suggested "a level of generality . . . to indicate that breaking into and entering a building to steal weapons would be one of the 'possession and trafficking offenses' excluded from 'another felony offense.'" Id.; see also United States v. Scolaro, 299 F.3d 956, 961 n.6 (8th Cir. 2002) (Bright, J., dissenting) (criticizing Kenney's analysis of Note 18, comparing Application Note 12 to § 2K2.1 and noting the relatively broad, unspecific language used in Note 18 to describe the offenses excluded under § 2K2.1(b)(5)).

The Sixth Circuit and our Court have similarly found that the theft or burglary of firearms is effectively a firearms possession offense. See United States v. Sanders, 162 F.3d 396, 399 (6th Cir 1998) ("[Note 18] states that 'another felony offense' refers to offenses other than the firearms possession or trafficking offenses. In this case there was one offense — the burglary of the pawnshop — which resulted in Defendant's possession of the instant firearms."); Fenton, 309 F.3d at 827 ("[Note 18] refers to offenses other than the firearms possession offense. In this case, there was no other offense. . . . Fenton's conduct was essentially stealing objects from the sporting goods store . . . ."); see also United States v. King, 341

F.3d 503, 507 ("[T]he defendants in Sanders inevitably possessed firearms upon completion of the burglary because the firearms were among the items taken during the burglary.").

We read Fenton (as well as Sanders and Szakacs, upon which Fenton relied) as standing for the proposition that, where a defendant is convicted for possession of firearms resulting from a theft of those same firearms, that theft is effectively a "firearms possession . . . offense" under Note 18, since that crime necessarily involves a taking and carrying away of the firearms involved. Accordingly, under Fenton, sentences resulting from such convictions may not be adjusted upwards under § 2K2.1(b)(5), because there does not exist "another felony offense."[3]

**B.**

Our reading of Fenton must also be understood as rejecting an approach that would read too much into its "distinction of time or conduct" requirement. In fact, the Sixth and Seventh Circuits, from which we originally borrowed the "distinction of

---

[3]Of course, Note 18 acknowledges that where firearms are used to facilitate a firearms possession or trafficking offense, the sentence may still be adjusted upwards in appropriate cases under § 5K2.6 (Weapons and Dangerous Instrumentalities).

time or conduct" language, have both since implicitly disavowed any understanding of that language that would so limit the scope of § 2K2.1(b)(5) as to contravene the intent of the drafters of the Guidelines. See King, 341 F.3d at 503; United States v. Purifoy, 326 F.3d 879 (7th Cir. 2003). For example, in King, the defendant (King) had gotten into a heated argument with a neighbor, and the argument culminated in King's going home, obtaining a shotgun, and returning to the neighbor's driveway, where he proceeded to point the gun threateningly at the neighbor's face and chest until the police arrived. King, 341 F.3d at 506. King argued that it was improper to apply § 2K2.1(b)(5) in his case, because the "conduct upon which he was convicted (felon in possession) was the same conduct the court used to enhance his sentence." Id. at 505. The Sixth Circuit found that "[t]he incredulity of [King's] argument renders it wholly unpersuasive." Id. at 507.

Similarly, in Purifoy, the defendant (Purifoy), who had been surprised by the sudden entry of police officers to execute a search warrant, ran into a bedroom, grabbed a loaded gun, and pointed it at one of the officers for 15 seconds before ultimately dropping it. Purifoy argued that the "aggravated assault was not 'another crime' for purposes of § 2K2.1(b)(5) because it occurred simultaneously with his federal offense of possession of a firearm by a felon." Purifoy, 326 F.3d at 880. The Seventh Circuit rejected this argument

fairly summarily, finding a distinction in conduct despite the practical contemporaneity of the possession and the assault. Id. at 881.

We agree with the common-sense outcomes of King and Purifoy, although not necessarily with all of the reasoning used to arrive at those outcomes. For example, the King court, in distinguishing Sanders, emphasized the temporal sequence and separability of King's actions: "Appellant first *possessed* the gun (offense of conviction) and then *used* the gun (enhancement conduct)." King, 341 F.3d at 506 (emphasis in original). But King did not explain why this same analysis would not just as easily have barred application of § 2K2.1(b)(5) in Sanders, as well. After all, it could be argued that the Sanders defendant first broke into the pawn shop with the intent to commit a felony (enhancement conduct) and then took and possessed the gun (offense of conviction). Under Sanders, it would seem that the mere fact that a criminal episode may be broken down into a series of separate actions would not necessarily be enough to create a "distinction in time or conduct."

With respect to Purifoy, there is some suggestion that the Court was willing to find a distinction between the firearm possession and the assault simply because of "the increased danger created by [the assault]." Purifoy, 326 F.3d at 881. While that increased danger would no doubt "justif[y]" an increased

sentence as a matter of policy, id., it is clear that § 2K2.1(b)(5) does not, by its own terms, apply only when the "other" felony poses some threshold risk of physical harm.[4]

We believe the better (and simpler) approach to cases like King and Purifoy would proceed by following the analysis of § 2K2.1(b)(5) that we outlined above. First, there can be no doubt that "possession of firearms by a felon" and "assault" are separate offenses under Blockburger, since each crime requires proof of at least one element that the other does not. Second, it is clear that, whatever the precise scope of the term "firearms possession and trafficking offenses" in Note 18, it cannot seriously be read as including the felony of assault with a firearm; otherwise, the Note 18 "exception" would effectively swallow the § 2K2.1(b)(5) rule.[5] Accordingly, the

crime of assault involves a sufficient "distinction . . . in conduct" from the crime of possession so as to constitute "another felony offense" for the purposes of § 2K2.1(b)(5).

## C.

Armed with this understanding of § 2K2.1(b)(5) and Fenton, we find that this case quite clearly presents "another felony offense" as that term from the Guidelines is to be properly understood. The felony offense alleged here is that of criminal mischief under Pennsylvania state law.[6] The government alleges that

consistent with the Note 18 analysis that disallows enhancement under § 2K2.1(b)(5) for firearms possession or trafficking offenses, but not for offences involving other uses of a firearm (such as assault).

We note that the characterization of theft or burglary of a firearm as a "firearms possession offense" without a doubt marks the extreme outer limits of that category. In this sense, the fact patterns of cases such as Sanders, Szakacs, and Fenton are practically *sui generis* in terms of the inapplicability of § 2K2.1(b)(5).

---

[4]Indeed, even if that were the case, it would not explain why a crime like burglary could not meet that threshold.

[5]There are, in fact, hints of this line of reasoning in the King and Purifoy cases, both of which distinguished their predecessors (Sanders and Szakacs) by stressing that those earlier cases involved only possession, rather than "use," of the firearms at issue. See King, 341 F.3d at 506 (stating that King's use of gun went beyond "mere possession"); Purifoy, 326 F.3d at 881 ("[Purifoy's] offense of conviction . . . involved mere possession of the firearm."). Such an emphasis is

[6]The government also argues that Lloyd committed reckless endangerment in placing and lighting the bomb. See 18 Pa.C.S. § 2705. Because we find the criminal mischief theory sufficient to sustain the sentence enhancement, we

8

Lloyd possessed the homemade bomb with "knowledge, intent, or reason to believe that it would be used . . . in connection with" an explosion causing at least $1,000 damage to property belonging to another. See U.S.S.G. § 2K2.1(b)(5); 18 Pa. C.S.A. § 3304. Criminal mischief is a second-degree misdemeanor punishable by up to two years of incarceration when it involves over $1,000 of damage, and that is sufficient to constitute a "felony" under Application Note 7 to § 2K2.1. See U.S.S.G. § 2K2.1, cmt. n.7 (defining "felony offense" as "any offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was brought, or conviction obtained"); 18 Pa. C.S.A. § 106(b)(7) (second-degree misdemeanor punishable by "term of imprisonment . . . not more than two years"); 18 Pa. C.S.A. § 3304(b).

There is no question that criminal mischief is a crime distinct from the crime of possession of unregistered explosives under Blockburger. The former requires proof of damage or endangerment to person or property, which is not required for the latter; the latter requires proof of nonregistration of a firearm or destructive device in the National Firearms Registration and Transfer Record, which is not required for the former. Moreover, criminal mischief is clearly not a "firearm

---

need not reach this alternative argument.

possession offense" under Note 18. The criminal mischief alleged here is more similar to the crime of assault (as in King and Purifoy) than it is to the crimes of burglary or theft that result in possession of firearms (as in Sanders, Szakacs, and Fenton). As with the firearms in King and Purifoy, the manner in which Lloyd used the bomb extended far beyond simple possession or trafficking. Accordingly, we hold that the Pennsylvania second-degree misdemeanor of criminal mischief constitutes "another felony offense" distinct from the felony of possession of an unregistered destructive device.

Although we decide this appeal in favor of the government, we decline to adopt the line of reasoning set forth in its brief, which is similar to that advanced by the Sixth Circuit in King: "At a distinct point . . . Lloyd moved beyond mere possession when he took the bomb and strategically positioned it under the fuel tank of Learn's truck and lit it. At that point, Lloyd committed 'another felony offense' . . . ." Appellee Br. at 22. While this focus on the temporal separation of the events comprising the larger criminal episode has a certain appeal, it is quite clearly not the approach taken in Fenton, where the Court declined to similarly separate for analytic purposes the breaking and entering (burglary) from the taking of the firearms (possession). Fenton binds this panel, and we believe that our approach, which relies instead on Blockburger and Note 18, is ultimately more faithful to

*Fenton*'s spirit.

## III.

Lloyd presents one final argument on appeal. He alleges that, even assuming that the government has properly alleged "another felony offense," there are still "insufficient facts by which to find that [he] intended to commit" criminal mischief. Appellee Br. at 9. The basis of this argument appears to be that the District Court never made any explicit finding that the possible or expected damage to Learn's truck would have exceeded $1,000 if the bomb had properly detonated. If satisfaction of the $1,000 threshold cannot be proved, argues Lloyd, then the criminal mischief offense would have been of a lower grade, would not have been punishable by at least a year of incarceration, and hence would not constitute a felony under Application Note 7 to § 2K2.1.

As Lloyd acknowledges, the government is required to prove facts underlying a sentence enhancement only by a preponderance of the evidence. United States v. Givan, 320 F.3d 452 (3d Cir. 2003). Moreover, the text of § 2K2.1(b)(5) of the Guidelines makes clear that a defendant need not have actually committed "another felony offense" to be eligible for an enhancement thereunder; rather, it is sufficient if the defendant "possessed . . . any firearm . . . with knowledge, intent, or reason to believe that it would be used or possessed in connection with another

felony offense."

The preponderance of the evidence in this case demonstrates that Lloyd intended or had reason to believe that his actions in connection with the bomb would result in at least $1,000 of damage to Learn's truck. Lloyd's claim that the record contains "no reference to the capability of [the] bomb" is plainly incorrect. The facts disclosed in Lloyd's Presentence Report (which the District Court adopted in full, see App. 20) indicate that (1) Spataro and an associate had constructed and successfully detonated a bomb prior to the construction of the bomb that was placed under Learn's truck, PSR ¶ 11, (2) the second bomb, like the first, contained a number of M-80-type explosive devices filled with a "perchlorate explosive mixture," PSR ¶¶ 7, 10, (3) the second bomb also contained "a quantity of ammonium nitrate prills, and a number of shotgun shells," PSR ¶ 7, and (4) "[i]n the opinion of the laboratory expert, the device would have exploded had it been properly lit," PSR ¶ 7. Indeed, at his change-of-plea proceedings held on September 24, 2002, Lloyd explicitly acknowledged that the bomb was "capable of exploding." App. 43.

Nevertheless, Lloyd contends that if the bomb had detonated it would have caused little damage to the truck "by virtue of most of the heat and/or energy following paths of least resistance: to any of the sides of [the] explosive device." App. 62. We are not readily convinced

10

by this argument, especially given the placement of the bomb under the fuel tank, PSR ¶ 13, the newness of the vehicle (a 2001 Chevrolet Silverado) at the time of the failed stunt (July 4, 2001), PSR ¶ 6, and the relatively low $1,000 threshold required under the criminal mischief statute. Moreover, even assuming, *arguendo,* that the bomb would not have caused $1,000 of damage had it exploded, what matters for the purposes of this case is how much damage Lloyd intended to cause or believed would be caused by the bomb. Simply put, we cannot believe that Lloyd and Spataro would have chosen a bomb as their instrument of revenge had they intended to cause only minor harm to Learn's vehicle. Nor would Lloyd have deliberately placed the bomb under the fuel tank had he not hoped that the bomb would ignite the gasoline in the tank. The obvious point of the entire scheme was to cause significant destruction; it defies reason to think that Lloyd could honestly have believed or intended that the detonation of the bomb beneath the fuel tank of Learn's recent-model truck would result in something less than $1,000 of damage. The government satisfied its burden of proof here.

## IV.

Because the District Court properly applied § 2K2.1(b)(5) in determining Lloyd's sentence, we affirm.

11